<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| HELEN and KONSTANTINOS NATSIS,<br><br>*Plaintiffs*,<br><br>v.<br><br>RICHARD TURNER, in his official capacity as Mayor of Weehawken, *et al*.<br><br>*Defendants*. | Civil Action No. 13-7269<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This matter arises out of a series of disputes – spanning years – regarding Plaintiffs' residential property that has a steep slope with a leaky sewer pipe.  Plaintiffs Helen and Konstantinos Natsis (individually "Helen" or "Konstantinos," collectively "Plaintiffs") sued their neighbors, the Township of Weehawken, and various individuals who work for Weehawken.  Currently pending are Defendants'[1] motion for summary judgment, D.E. 202, and Plaintiffs'

---

[1] The moving Defendants are Mayor Richard Turner, Frank Lamolino, Frank Tattoli, Shawn Masterson, Vincent Rivelli, Police Officer Augusto A. Same, Police Officer Conrad Hablitz, Sergeant Patrick Cannon, Detective Sergeant Deputy Chief Jeffrey Fulcher, Sergeant John Johnson, and Township of Weehawken (collectively, "Weehawken Defendants").  D.E. 203. When referring to a Defendant individually, the Court uses his/her/its name, and otherwise refers to them collectively as Defendants.

The remaining Defendants are Plaintiffs' neighbors Harry and Denise Hodkinson ("Hodkinson Defendants").  On September 19, 2018, the Hodkinson Defendants filed a letter "to join with the Weehawken Defendants seeking permission to file a motion for summary judgment dismissing this action as against them." D.E. 183 at 1.  The Court granted the Hodkinson Defendants leave to file the motion. D.E. 199.  The Hodkinson Defendants, however, never actually filed a motion

motion for leave to file a Fourth Amended Complaint, D.E. 228.   The Court reviewed all submissions made in support and in opposition to the motions[2] and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b).   For the reasons stated below, Plaintiffs' Motion for Leave to File a Fourth Amended Complaint is **DENIED**, and Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

## I.   BACKGROUND

### 1.   **Factual Background**[3]

In March 2000, Plaintiffs Helen and Konstantinos Natsis purchased 347-353 Park Avenue, Weehawken, New Jersey ("Property").  Pl. Supp. SOMF ¶ 1.  When Plaintiffs bought the Property, it was littered with trash, dead trees, sinks, toilet bowls, and other debris.  *Id.* ¶ 18.  Plaintiffs obtained title insurance from Old Republic National Title Insurance Company.  *Id.* ¶ 2.  It was later discovered that an easement for sewer pipes existed through the Property which Plaintiffs' neighbors – the owners of 80 Hackensack Plank Road – were responsible for maintaining.  *Id.* ¶ 3. Defendants Harry and Denise Hodkinson purchased 76 Hackensack Plank Road which was "uphill from the Plaintiffs and was illegally plugged into the malfunctioning sewer easement."  *Id.* ¶ 154.

---

for summary judgment nor did they file any document joining in the arguments of the Weehawken Defendants.  In short, the Hodkinson Defendants have not moved for summary judgment.

[2] Defendants' brief in support of their motion for summary judgment is referred to as "Def. Br." (D.E. 202-2); Plaintiffs' brief in opposition is referred to as "Pl. Opp." (D.E. 218); and Defendants' reply brief is referred to as "Def. Reply" (D.E. 225).  Plaintiffs' brief in support of their motion for leave to file a Fourth Amended Complaint is referred to as "Pl. Brief" (D.E. 228-51); the Weehawken Defendants' brief in opposition is referred to as "Def. Opp." (D.E. 229).

[3] The background facts are drawn from Defendants' Statement of Material Facts Not in Dispute ("DSOMF"), D.E. 181-1, Plaintiffs' Responsive Statement ("Pl. Resp. to DSOMF"), D.E. 189-1, Plaintiffs' Supplemental Statement ("Pl. Supp. SOMF"), D.E. 189-2, and Defendants' Response to Plaintiffs' Supplemental Statement ("Def. Resp. to PSOMF"), D.E. 225-1.

Sewer waste and water regularly flowed onto the Property from the sewer lines of Plaintiffs' neighbors living above the Palisades Cliff. *Id.* ¶ 30. Plaintiffs complained to Weehawken municipal departments, the mayor, the media, and their neighbors about the failure to repair the broken sewer line. *Id.* ¶ 37. Konstantinos also frequently worked in his yard cleaning and gardening. DSOMF ¶ 19. On multiple occasions over the course of many years, Plaintiffs were issued summonses by Defendants for, among other things, failure to obtain approvals from the Planning Board before working on the Property, for violations of Weehawken's "Steep Slope Ordinance," and for public health nuisances. *See, e.g.*, Pl. Supp. SOMF ¶¶ 20, 22, 24, 40; DSOMF ¶¶ 178-208. Defendants list about twenty-five summonses, violations, and stop construction orders issued between 2001 and 2009. DSOMF ¶¶ 178-208. Eleven of the summonses were later dismissed in municipal court. *Id.* ¶¶ 203-207.

Since 2001, Plaintiffs have filed many complaint letters with the Weehawken Building Department, Mayor Turner, the Weehawken Police Department, and other town and state officials. *See, e.g., id.* ¶¶ 60, 76, 151, 153, 162, 170, 239. Plaintiffs have applied for permits and hired their own engineers, contractors, and other experts to evaluate the Property and offer recommendations for work and permit approvals. *See, e.g., id.* ¶¶ 58, 61, 256. Plaintiffs claim that many of their requests for work permits have been denied by the Weehawken Building Department, Pl. Supp. SOMF ¶¶ 42, 58, 61, 265, 281, and while it is true that many have been denied, Defendants point out that a number of Plaintiffs' cited exhibits do not support this proposition. Over the years, various work has been done on the Property pursuant to court orders – without Plaintiffs' consent – regarding emergent circumstances by way of proceedings instituted by the Township. *See, e.g., id.* ¶¶ 53, 67, 118, 149.

3

Plaintiffs and certain Defendants have a history of state court litigation. On July 18, 2001, the Weehawken Municipal Court issued an order permitting the Township emergency access to the Property and requiring Plaintiffs to pay for the emergency repairs. DSOMF ¶ 4. In light of further disputes over permit denials and access to Plaintiffs' property, Plaintiffs sued the Township and several other Defendants in the Superior Court of New Jersey on May 31, 2002 (the "Natsis I Litigation"). *Id.* ¶ 5. Following a trial, on November 17, 2004, the state judge ordered that judgment be entered in favor of the Township and against Plaintiffs in the amount of $123,841.00. *Id.* ¶ 14. On December 13, 2004, that same court entered a stipulation of dismissal, but "the Township of Weehawken, Frank Tattoli, Pat Cannon, P.O. Hablitz, and Vincent Rivelli" agreed to "waive any and all statute of limitations defenses." *Id.* ¶ 15. On July 15, 2005, a writ of execution was entered against Plaintiffs. *Id.* ¶ 175. Plaintiffs appealed the judgment, resulting in the New Jersey Appellate Division reversing and remanding the matter. *Id.* ¶ 17. The second trial resulted in a June 3, 2008 judgment for Plaintiffs against their neighbors, the Pamperins. Pl. Supp. SOMF ¶ 201. The Pamperins are no longer parties to this matter.

On August 16, 2008, the Township filed an order to show cause and verified complaint against the Plaintiffs in Superior Court of New Jersey for work done on the Property without the proper permits (the "Natsis II Litigation"). DSOMF ¶ 18; Pl. Supp. SOMF ¶ 206. The order to show cause was granted in 2008 and a nine-day trial resulted in a February 27, 2012 judgment in favor of the Township. DSOMF ¶¶ 20, 25. Plaintiffs were directed to remediate and restore the Property in compliance with Weehawken's Steep Slope Ordinance. *Id.* ¶ 25. The decision was upheld on appeal. *Id.* ¶ 30. In January 2013, the Hudson-Essex-Passaic Soil Conservation District ("HEPSCD") issued a stop work order pertaining to construction and other activity on the Property, revoking an exemption Plaintiffs had been granted in May 2012. *Id.* ¶¶ 29, 246.

4

Konstantinos testified that "the Mayor and his officials opposed his wish[] to develop his land because he did not support [M]ayor Turner in the 2002 election." *Id.* ¶ 167. Helen testified that "her family has been the only ones discriminated against," but was unable to provide proof as to whether her neighbors were able to obtain approvals permitting building, renovation, or remodeling. *Id.* ¶ 170. Helen also testified that she had no information to support the allegation that her neighbors were political supporters of Mayor Turner. *Id.* ¶¶ 216-17.

The parties dispute the following facts, among many others. The parties disagree whether the Property is located in Weehawken's "Steep Slope District." *Id.* ¶ 79; Pl. Resp. to DSOMF ¶ 79. Defendants claim Plaintiffs must abide by the Steep Slope Ordinance, but Konstantinos testified he did not need a permit to take certain actions such as removing trees from the Property. DSOMF ¶ 88.

The parties also dispute Konstantinos' arrest history. According to the Weehawken Police Department's local arrest history tracking system, Konstantinos was arrested in April 2000, February 2002, January 2004, April 2009 (twice), and April 2012. Pl. Supp. SOMF ¶ 103. The facts of Konstantinos' February 6, 2002; January 28, 2004; and April 5, 2012 arrests are relevant to Plaintiffs' false arrest and malicious prosecution claims. DSOMF ¶¶ 219, 228, 237.

Konstantinos was arrested on February 6, 2002 by Defendant Cannon and charged under N.J.S.A. 2C:17-2(2) for "risking or causing widespread injury or damage" by breaking the sewer pipe. *Id.* ¶¶ 219-20. Konstantinos claims Cannon "did not have any personal knowledge" that Konstantinos broke the sewer pipe, lacked probable cause, and filed a "false and malicious" report. Pl. Supp. SOMF ¶¶ 87-88. Defendants deny these facts and claim that Cannon testified that there was probable cause based on witness statements made to him at the time. Def. Resp. to PSOMF ¶¶ 87-88; DSOMF ¶ 224. The investigative report signed by Cannon states that Cannon met with

three of Plaintiffs' neighbors who "gave hand[-]written statements that after the pipe was repaired by the city [Konstantinos] broke the pipe with a pick-axe." D.E. 202, Ex. JJJJ. The report further notes that Cannon advised Assistant Prosecutor Jack Hill of the Hudson County Prosecutor's Office of the situation and Hill stated that Cannon should criminally charge Konstantinos. *Id.* Defendants claim that according to a deposition, Konstantinos "understood that an assistant prosecutor made a determination that there was probable cause for his arrest," DSOMF ¶ 222, which Plaintiffs deny. Defendants state that the Township "has no further documents regarding this arrest as the information was signed out for trial in the Hudson County Superior Court in 2002 and never returned," *id.* ¶ 226, whereas Plaintiffs contend "the warrant application and supporting documents never existed." Pl. Resp. to DSOMF ¶ 226.

According to Plaintiffs, on January 28, 2004, Defendant Hablitz arrested Konstantinos for "failing to produce identification so that [Hablitz] could issue a summons for throwing snow into a public area in violation of a local Weehawken ordinance." Pl. Supp. SOMF ¶ 105. Plaintiffs claim that Hablitz was aware that Konstantinos' identification was in the house and that Helen was retrieving it at the time of Konstantinos' arrest. *Id.* According to Defendants, Hablitz testified that he arrested Konstantinos "because he was attempting to issue a summons and [Konstantinos] was not cooperating" but do not provide any further factual account of the arrest. DSOMF ¶ 229.

On April 5, 2012, Konstantinos was arrested on a warrant. *Id.* ¶ 245. Defendants state that Defendant Tattoli "swore out a complaint against [Konstantinos] as he was doing something with the blue stone from the foundation of the residents up top of the hill and it was causing an avalanche condition." *Id.* ¶ 238. Defendants claim Tattoli personally witnessed the dangerous condition created by Konstantinos pushing stones down the hill, which Plaintiffs deny. *Id.* ¶ 239; Pl. Resp. to DSOMF ¶ 239. Plaintiffs claim that Defendant Tattoli "did not have personal knowledge, and

instead was basing his criminal complaint on Mrs. Hodkinson's false report." Pl. Resp. to DSOMF ¶ 239. Defendants state that Defendant Tattoli "made a written statement in support of the probable cause for the arrest." DSOMF ¶ 240. Plaintiffs claim that no arrest warrant was presented to a judge for a probable cause determination. Pl. Supp. SOMF ¶ 245.

### 2. Procedural History

Plaintiffs commenced this litigation on December 3, 2013, filing their initial Complaint *pro se*. D.E. 1. On November 14, 2014, Judge Cecchi granted certain Defendants' motions to dismiss, D.E. 61, and Plaintiffs then filed their First Amended Complaint ("FAC") on December 12, 2014. D.E. 64. On February 29, 2016, Judge Cecchi granted in part and denied in part Defendants' motion to dismiss the FAC. D.E. 113.

The case was then transferred to the undersigned. D.E. 117. On March 30, 2016, Plaintiffs filed a Second Amended Complaint ("SAC"), which consisted of eleven causes of action. D.E. 123 ¶¶ 407-509. Defendants filed a partial motion to dismiss the SAC, D.E. 134, which the Court granted in part and denied in part, D.E. 146. Count One (Lack of Political Affiliation under the New Jersey Civil Rights Act ("NJCRA")), Count Two (Retaliation for Lack of Political Affiliation under 42 U.S.C. § 1983), Count Three (Free Speech Retaliation under NJCRA), and Count Four (Free Speech Retaliation under 42 U.S.C. § 1983) were dismissed with prejudice as to Defendants Fulcher, Lamolino, and Mayor Turner (in his personal and official capacity). *Id.* Count Five (False Arrest) was dismissed with prejudice as to Helen and Defendants Fulcher and Lamolino. *Id.* Count Five (False Arrest) was also dismissed as to Konstantinos' arrest in 2009. *Id.* Count Seven (Abuse of Process) was dismissed without prejudice and Count Ten (Civil Conspiracy) was dismissed with prejudice. *Id.* All Counts as to Defendants Same and Johnson were dismissed without prejudice. *Id.*

On April 10, 2017, Plaintiffs filed a Third Amended Complaint ("TAC") alleging the following eleven causes of action: (1) Lack of Political Affiliation under NJCRA; (2) Retaliation for Lack of Political Affiliation under 42 U.S.C. § 1983; (3) Free Speech Retaliation under NJCRA; (4) Free Speech Retaliation under 42 U.S.C. § 1983; (5) False Arrest; (6) Malicious Prosecution; (7) Abuse of Process; (8) Equal Protection under 42 U.S.C. § 1983; (9) Municipal Liability under 42 U.S.C. § 1983; (10) Civil Conspiracy under 42 U.S.C. § 1985; and (11) "Taking of Property without Just Compensation."  D.E. 148 ¶¶ 434-524.  The remaining Defendants are the Weehawken Defendants (who brought the present summary judgment motion) and the Hodkinson Defendants, who Plaintiffs allege "acted at the direction, or in conjunction with, the Defendant state actors engaged in a pattern of harassment and retaliation against Plaintiffs."  TAC ¶¶ 22-23.

Magistrate Judge Falk entered a July 10, 2017 Scheduling Order that set a fact discovery end date of January 1, 2018.  D.E. 158.  On June 26, 2018, Judge Falk extended the discovery deadlines, allowing for the parties to submit new or supplemental expert reports until July 10, 2018.  D.E. 180.

On July 12, 2017, the Court issued a consent Stipulation of Dismissal.  D.E. 160.  As a result, the following Defendants were dismissed from the case with prejudice: Township of Weehawken Police Department, Thomas White, Rene Roa, Iggy Mitolo, Dona Jandik, Tracy Pamperin, and Kim Pamperin.  *Id.*  And the following claims were also dismissed: Konstantinos' claims for false arrest in 2009 as well as Count Ten (Civil Conspiracy).  *Id.*

On April 18, 2019, the Weehawken Defendants filed the current motion for summary judgment.  D.E. 202.  Plaintiffs opposed the motion, D.E. 218, to which Defendants replied, D.E.

225.  As referenced in note 1 above, the Hodkinson Defendants were granted leave to file a summary judgment motion but did not do so.

On October 11, 2019, Plaintiffs filed a letter requesting leave to amend discovery and to file a motion for leave to amend the pleadings, D.E. 220, which both the Weehawken and Hodkinson Defendants opposed, D.E. 221-22.  Plaintiffs indicate that in May 2019, after the Weehawken Defendants filed the motion for summary judgment, Plaintiffs retained a licensed engineer to inspect the condition of erosion and stormwater management.  D.E. 228-1 at 3. Plaintiffs' engineer completed the inspection on June 7, 2019.  *Id.*  A report was authored on September 4, 2019 and was provided to all Defendants on October 7, 2019.  *Id.* at 4.  In sum, the expert opined that "Defendant Hodkinson's property … was still contributing to the ongoing stormwater runoff, falling rock, and other debris that was causing a hazard on Plaintiffs' property (and by extension to the public)."  *Id.*  On March 17, 2020, Plaintiff filed the pending motion for leave to file a Fourth Amended Complaint and to extend the discovery scheduling order.  D.E. 228.  The Weehawken Defendants objected to the motion.  D.E. 229.

## II.   MOTION FOR LEAVE TO FILE FOURTH AMENDED COMPLAINT

Motions to amend are normally governed by Federal Rule of Civil Procedure 15(a), while motions to amend after a deadline in a scheduling order are also subject to a higher "good cause" standard set forth in Rule 16.  Under Rule 15(a), once a responsive pleading has been filed, "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  A court "should freely give leave when justice so requires."  *Id.*  As a result, leave to amend is generally granted unless there is (1) undue delay or prejudice; (2) bad faith; (3) dilatory motive; (4) failure to cure deficiencies through previous amendment; or (5) futility.  *Forman v. Davis*, 371 U.S. 178,

182 (1962).  The ultimate decision to grant or deny leave to amend is a matter committed to

the Court's sound discretion.  *See, e.g. Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401

U.S. 321, 330 (1971).  The futility analysis on a motion to amend is essentially the same as

a Rule 12(b)(6) motion.  *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002)

("An amendment would be futile when 'the complaint, as amended, would fail to state a

claim upon which relief could be granted.'").  For a complaint to survive dismissal, it "must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).

However, a party seeking to amend the pleadings after a deadline in a scheduling order

must satisfy the requirements of Rule 16(b)(4); the party must show good cause.  *See* Fed. R. Civ.

P. 16; *Grasso v. Consol. Rail Corp.*, No. 12-398, 2013 WL 3167761 at *5 (D.N.J. June 20, 2013);

*see also Dimensional Commc'n, Inc. v. OZ Optics, Ltd.*, 148 F. App'x 82, 85 (3d Cir. 2005)

(observing that good cause standard applies when determining the propriety of a motion to amend

after the scheduling order deadline passed).  Whether "good cause" exists under Rule 16 rests

primarily on the diligence, or lack thereof, of the moving party.  *GlobespanVirata, Inc. v. Texas

Instruments, Inc.*, No. 03-2854, 2005 WL 1638136, at *3 (D.N.J. July 12, 2005).  In determining

whether good cause exists, courts typically consider whether the movant possessed, or through the

exercise of reasonable diligence should have possessed, the knowledge necessary to file the motion

to amend before the deadline expired.  *See Stallings ex rel. Estate of Stallings v. IBM Corp.*, No.

08-3121, 2009 WL 2905471, at *16 (D.N.J. Sept. 8, 2009) (denying plaintiffs' motion to amend

because they "had sufficient information to state the proposed claims well in advance of the

[s]cheduling [o]rder deadline").

Plaintiffs filed the pending motion to amend, requesting that the Court extend the discovery deadline and also permit Plaintiffs to file a Fourth Amended Complaint.  Pl. Br. at 4.  Plaintiffs claim there is good cause for the amendment "in light of newly discovered evidence" revealing "ongoing nuisances and trespasses harming Plaintiffs" coming from Defendants Hodkinsons' property.  *Id.* at 1.  Plaintiffs contend that the amendment to add additional state law claims will not cause undue delays or prejudice to any parties. *Id.* at 5.  Plaintiffs acknowledge that the Court's scheduling order for the production of expert reports has long expired, but claim that "Plaintiffs could not reasonably have produced a report until the inspection" was conducted.  *Id.* at 7.  However, Plaintiffs fail to provide an adequate explanation for why the inspection could not have been conducted earlier.

The Weehawken Defendants argue that Plaintiffs fail to establish that the amendment is warranted under either Rule 15 or Rule 16.  Def. Opp. at 2-15.  Defendants claim that Plaintiffs' motion reflects undue delay because the case was filed in 2013, Plaintiffs have filed previous amended complaints, the proposed amendment came after the motion for summary judgment, and Plaintiffs fail to provide any justification for the delay.  *Id.* at 4-5.  The Weehawken Defendants add that the amendment would unduly prejudice Defendants by requiring Defendants to conduct additional fact and expert discovery as well as file another dispositive motion nearly seven years into the case.  *Id.* at 9.  Defendants also point out that Plaintiffs were aware of the issues of runoff and debris no later than when they filed their Third Amended Complaint, which referred to the runoff.  *Id.* at 2.

The Court agrees with Defendants.  The court-imposed deadline for the parties to submit new or supplemental expert reports was July 10, 2018.  D.E. 180.  The parties completed motion

11

practice on Defendants' summary judgment motion in October 2019.   Nonetheless, Plaintiffs disclosed a new expert report on October 7, 2019 and filed the pending motion seeking leave to amend the discovery schedule on March 17, 2020.  D.E. 228-1 at 4.  Plaintiffs argue that they could not have produced the report until the inspection had occurred.  This may be accurate, but Plaintiffs have provided no explanation – let alone a reasonable explanation – as to why the inspection could not have been conducted earlier.  As Defendants explained, Plaintiffs were well aware of sewer runoff problems in 2017 at the latest.  Def. Opp. at 3.  As a result, Plaintiffs fail to meet the "good cause" standard for amendment under Rule 16.

Given the length and current posture of this case and the fact that this would be Plaintiffs' third amendment, the Court also finds that amendment would cause undue delay and prejudice under Rule 15.  The Defendants have a right to have this case determined in a reasonable time frame.   Additional claims would not only lead to further discovery but also motion practice. Plaintiffs have provided no legitimate reason for their delay in conducting the inspection, submitting their expert report, and filing the pending motion.  For the foregoing reasons, the Court denies Plaintiffs' motion to amend and proceeds to resolve Defendants' motion for summary judgment.

### III.     MOTION FOR SUMMARY JUDGMENT

#### 1.   Summary Judgment Standard

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment.  *Id.*  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).  A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at

13

250.  "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment."  *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case."  *Celotex Corp.*, 477 U.S. at 322.  "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate.  *See Anderson*, 477 U.S. at 250-51.

### 2.  ANALYSIS

#### i.  Defendants Lamolino, Same, Johnson, Masterson, and Fulcher

Defendants argue that "Plaintiffs' complaint *fails to assert* viable causes of action as to" Defendants Lamolino, Same, Johnson, Masterson, and Fulcher. Def. Br. at 5-7 (emphasis added). Defendants argue that the claims against each Defendant must be dismissed, referring in their brief only to allegations set forth in the TAC and failing to cite to any evidence in the record. Defendants' argument relates to a motion to dismiss, not a motion for summary judgment.  When dismissing claims at the summary judgment phase, courts must look to facts and evidence in the record, not mere allegations.  As a result, the Court denies Defendants' request to dismiss the claims against Defendants Lamolino, Same, Johnson, Masterson, and Fulcher.

#### ii.  Doctrine of Laches and Statute of Limitations

Defendants next argue that Plaintiffs' claims for malicious prosecution, abuse of process, and the false arrest claims of 2002 and 2004 are barred by the doctrine of laches. Def. Br. at 8-13. Laches is an equitable doctrine that consists of two elements: "(1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay."  *Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005) (internal citation omitted).  Plaintiffs

14

respond that that Defendants' argument fails because Defendants failed to assert laches as an affirmative defense. Pl. Opp. at 3. According to the Federal Rules of Civil Procedure, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defenses, including … laches[.]" Fed. R. Civ. P. 8(c)(1). Since the Defendants failed to plead laches as an affirmative defense, the Court denies Defendants' request to bar Plaintiffs' claims under the doctrine of laches.

Defendants also argue that the claimed acts of retaliation which occurred before December 3, 2011 fall outside the scope of the statute of limitations. Def. Br. at 14. "The statute of limitations for any [Section] 1983 claim is the forum state's limitations statute for personal injury actions." *Levine v. New Jersey State Dep't of Cmty. Affairs*, 231 Fed. App'x 125, 127 (3d Cir. 2007). Since New Jersey has a two-year statute of limitations for personal injury actions, the Third Circuit has adopted this two-year period for Section 1983 actions. *Id.* Likewise, a two-year statute of limitations applies to Plaintiffs' NJCRA claims. *See Hawkins v. Feder*, No. A-4444-12T4, 2014 WL 6977836, at *1 (N.J. Super. Ct. App. Div. Dec. 11, 2014). As stated by Judge Cecchi in her 2016 motion to dismiss opinion, "[s]ince Plaintiffs filed their original federal complaint on December 3, 2013, D.E. 1, the latest date on which the facts giving rise to their Section 1983 and NJCRA claims could have occurred – absent some tolling exception – would be December 3, 2011." D.E. 113 at 8-9.

Defendants first argue that the 2004 waiver of the statute of limitations in the Natsis I Litigation "is unlimited and must be barred as against public policy and void." Def. Br. at 15. Defendants further argue that "even if the waiver was not void, it could only include those claims contemplated and pled at the time it was entered into in December of 2004." *Id.* at 16. Plaintiffs' amended complaint in the Natsis I Litigation did not include claims for retaliation under the First

15

Amendment.  D.E. 202, Ex. F.  Therefore, Defendants argue that the 2004 waiver of the statute of limitations cannot apply to the claims for retaliation in Counts One through Four.  Def. Br. at 16. Plaintiffs respond that the statute of limitations waiver is valid and applicable.  Pl. Opp. at 6-7. However, Plaintiffs fail to address whether the waiver applies to the retaliation acts in particular.

The 2004 waiver states as follows: "It is hereby stipulated and agreed that Counts 8-26 of the complaint against defendants, Township of Weehawken … Frank Tattoli, Det. Sgt. Pat Cannon, P.O. Hablitz … and Vincent Rivelli be and it is hereby voluntarily dismissed without prejudice.  These defendants agree to waive any and all statute of limitations defenses."  D.E. 202, Ex. K.  The Court finds that Defendants waived "any and all statute of limitations defenses" *as to the claims laid out in Counts 8-26*, which did not include First Amendment retaliation claims. There is no indication in the waiver that it applied to *unasserted*, related claims.  And Plaintiffs fail to provide any authority indicating that the waiver should be extended to such claims. Therefore, the Court finds that the 2004 statute of limitations waiver does not apply to Counts One through Four.

This finding, however, does not end the inquiry.  The second issue is whether the continuing violations doctrine applies.  Under the continuing violations doctrine, "a plaintiff can sue for actions that occurred outside the applicable limitations period if 'a defendant's conduct is part of a continuing practice [and] … the last act evidencing the practice falls within the limitations period.'"  *Cibula v. Fox*, 570 F. App'x 129, 135 (3d Cir. 2014) (internal citation omitted).  "To determine whether a practice was continual, a court must consider (1) whether the violations are part of the same subject matter and (2) whether the violations occurred frequently."[4]  *Id.*

---

[4] The parties do not address whether the continuing violations doctrine is a jury issue.  While the Court did not find binding precedent from the Third Circuit on the issue, the First Circuit ruled

16

Defendants argue that the continuing violations doctrine does not apply to Plaintiffs' claims "because they are based upon separate acts which [Plaintiffs] knew or should have known, were actionable at the time they occurred, namely, that the issuance of summons[es], violations, stop work orders, denials of permits and arrests of Konstantinos Natsis were actionable before December 2011." Def. Br. at 18. Plaintiffs respond that "the Weehawken Defendants have caused Plaintiffs to suffer continuous, ongoing civil rights violations that should trigger a tolling of the statute of limitations to Plaintiffs' claims not preserved by the waiver." Pl. Opp. at 7.

The Third Circuit has found that the continuing violations doctrine applies in Section 1983 cases. *See Bennett v. Susquehanna Cty. Children and Youth Servs.*, 592 Fed. App'x 81, 85 (3d Cir. 2014); *Cowell v. Palmer Twp.*, 263 F.3d 286, 293 (3d Cir. 2001). In *Bennett*, the Third Circuit found that "the continuing violations doctrine is not a substitute for a plaintiff's 'awareness of and duty to assert his/her rights' in a timely fashion," and, as such, the doctrine "does not apply when plaintiffs are aware of the injury at the time it occurred." *Bennett*, 592 Fed. App'x at 85 (quoting *Cowell*, 263 F.3d at 295; *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 416 n.6 (3d Cir. 2003)).

In *Flanders v. Dzugan*, a property owner sued a municipality and building code official alleging civil rights violations "related to [his] unsuccessful attempt to construct an addition to his business premises." 156 F. Supp. 3d 648, 655 (W.D. Pa. 2016). Flanders alleged that the defendants deprived him of his protected property interest by, among other things, failing to issue building and demolition permits, issuing a stop work order, refusing to grant a variance, and

---

that "[u]nless there are no material facts in dispute permitting resolution as a matter of law as to whether a continuing violation occurred, it is a jury issue." *O'Rourke v. City of Providence*, 235 F.3d 713, 727 (1st Cir. 2001). The Court follows this First Circuit decision as persuasive because it is analogous to the affirmative defense of statute of limitations, which is also jury issue when there is a genuine issue of material fact.

criminally prosecuting him. *Id.* at 665. Flanders argued that the continuing violations doctrine rendered his claim timely. The district court, citing *Bennett*, found that the doctrine did not apply because Flanders was aware of a number of the wrongs (including the refusal to issue a construction order and issuance of a stop work order) at the time they occurred, far before the applicable limitations period. *Id.* at 667 (citing *Bennett*, 592 Fed. App'x. at 85).

In *Holt v. Pennsylvania*, a police officer alleged discrimination and First Amendment retaliation claims against various defendants while he was employed with the Pennsylvania State Police. No. CV 17-2511, 2018 WL 2363535, at *1 (E.D. Pa. May 24, 2018). Holt relied on numerous adverse actions and incidents over the course of many years in support of his claims against multiple Defendants. *Id.* Holt argued that these many incidents, "when viewed as a whole, 'developed a continuing practice to retaliate against Plaintiff for first amendment activity.'" *Id.* at *8. The court found that "[t]his effort to invoke to continuing violations doctrine improperly lumps the acts of the various Defendants together, disregarding the fundamental principle that 'a defendant in a civil rights action must have personal involvement in the alleged wrongs[.]'" *Id.* To comply with the continuing violations doctrine, the court held, "a plaintiff must establish, for each defendant, that his/her acts outside the limitations period were part of a continuing practice by that same defendant with the last act by that defendant falling within the limitations period." *Id.*

In defining "continuing practice," a court in this Circuit has found that "if the allegedly violative acts that occurred before the limitations period were 'discrete' then they are time-barred." *Nahouraii v. Ind. Univ. of Pennsylvania*, No. 2:11-CV-00973, 2015 WL 401422, at *12 (W.D. Pa. Jan. 28, 2015) (internal citation omitted). Therefore, a critical distinction in the continuing violations doctrines lies in "discrete and non-discrete acts." *Id.* Discrete acts are "easy to identify,"

18

whereas non-discrete acts "necessarily 'occur [] over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-115 (2002)).

In requesting that the Court apply the continuing violations doctrine, Plaintiffs point to "'emergency repairs' and forced inspection by the Township since 2001," the issuance of violations, the denial of permits, state court litigation, and the arrest of Konstantinos in 2012. Pl. Opp. at 13-14. However, all of these acts are "easy to identify" and therefore constitute discrete acts as opposed to non-discrete acts. Like in *Bennett* and *Flanders*, Plaintiffs were aware of each of these discrete acts and injuries at the time they occurred, and "the continuing violations doctrine is not a substitute for a plaintiff's 'awareness of and duty to assert his/her rights' in a timely fashion." *Bennett*, 592 Fed. App'x at 85. The Court concludes that the continuing violations doctrine does not apply.

### iii.  Plaintiffs' Section 1983 and NJCRA Claims

Plaintiffs bring Counts Two, Four, Five, and Nine pursuant to Section 1983. Section 1983, in relevant part, provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 does not provide substantive rights; rather, Section 1983 provides a vehicle for vindicating violations of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To state a Section 1983 claim, a plaintiff must demonstrate that "(1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or

19

territorial law." *Burt v. CFG Health Sys.*, No. 15-2279, 2015 WL 1646849, at *2 (D.N.J. Apr. 14, 2015).

Plaintiff brings Counts One and Three pursuant to the New Jersey Civil Rights Act ("NJCRA"). Like Section 1983, The NJCRA affords a private cause of action to

> [a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law.

N.J.S.A. 10:6-2. Civil claims for a violation of the New Jersey Constitution can only be asserted by way of the NJCRA, which is interpreted analogously to Section 1983. *Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 548 (D.N.J. 2013); *see also Roman v. City of Newark*, No. 16-1110, 2017 WL 436251, at *3-4 (D.N.J. Jan. 31, 2017). The "NJCRA was modeled after [Section] 1983, [and so] courts in New Jersey have consistently looked at claims under the NJCRA through the lens of [Section] 1983 and have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart." *Velez v. Fuentes*, No. 15-6939, 2016 WL 4107689, at *5 (D.N.J. July 29, 2016) (internal quotations and citation omitted). Therefore, the Court considers Plaintiffs' Section 1983 and NJCRA claims together.

### 1. Retaliation Claims

Plaintiffs assert retaliation claims pursuant to 42 U.S.C. § 1983 for violations of the First Amendment of the United States Constitution as well as the NJCRA, N.J.S.A. 10:6-2, and Article 1, Section 18 (right of assembly and to petition) of the New Jersey Constitution. TAC ¶¶ 424-62. Plaintiffs assert Counts One and Two for lack of political affiliation retaliation and Counts Three and Four for free speech retaliation. *Id.*

In order to succeed on a retaliation claim under the First Amendment, a plaintiff must demonstrate "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)). "The key question in determining whether a cognizable First Amendment claim has been stated is whether the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." *Id.* (citing *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (internal quotation marks omitted)); *see also Crawford-El v. Britton*, 523 U.S. 574, 588 n. 10 (1998) ("The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of [a constitutionally] protected right."). The third element, "a causal link," requires "but-for" causation. *Mirabella v. Villard*, 853 F.3d 641, 651 (3d Cir. 2017) (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "In order to establish the required causal connection, a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Rink v. Ne. Educ. Intermediate Unit 19*, 717 F. App'x 126, 133 (3d Cir. 2017) (citing *Lauren W.*, 480 F.3d at 267).

Counts One and Two assert retaliation for lack of political affiliation. TAC ¶¶ 424-42. Plaintiffs allege that they "openly opposed Mayor Turner politically," *id.* ¶ 437, and in response, Defendants "retaliated against Plaintiffs based of [sic] Defendants['] actual or perceived belief that Plaintiffs were not politically affiliated with Mayor Turner and openly opposed his political policies in the Township of Weehawken," *id.* ¶ 427. Plaintiffs claim that Defendants' retaliation against Plaintiffs – which included filing false reports, selectively enforcing ordinances, denying

21

Plaintiffs permit applications – was "substantially motivated by Plaintiffs['] actual and/or perceived lack of political affiliation and support of Mayor Turner." *Id.* ¶ 430.

Defendants respond that Plaintiffs fail to set forth a violation of their First Amendment rights for political affiliation. Def. Br. at 25. Critically, Defendants claim that there is "no evidence that anyone in Weehawken was aware of the Plaintiffs' political affiliation. Plaintiffs have identified no evidence in the record anyone was aware of their lack of support for Mayor Turner." *Id.* at 26. In their opposition, Plaintiffs fail to point to any evidence that they openly opposed Mayor Turner politically or that Defendants were ever aware of either Plaintiffs' political affiliation or opposition to Mayor Turner.

The third element of a retaliation claim under the First Amendment requires "a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas*, 463 F.3d at 296. Of course, before a defendant can retaliate against a plaintiff for constitutionally protected activity, the defendant must be aware of such activity. In failing to provide any evidence that Plaintiffs openly opposed Mayor Turner politically or that Defendants were aware of such activity, Plaintiffs fail to provide sufficient evidence of a necessary element of their claim – a causal link between the alleged constitutionally protected conduct and retaliatory action. Plaintiffs have failed to point to any genuine dispute as to any material fact on this issue, and Defendants are entitled to judgment as a matter of law. Therefore, summary judgment is granted as to Counts One and Two.

Counts Three and Four of Plaintiffs' TAC assert free speech retaliation. TAC ¶¶ 443-62. Plaintiffs claim that they engaged in protected free speech activities in the form of complaints to municipal entities and the media regarding "the inefficacies of public officials and the denial of municipal resources in the Township of Weehawken," lawsuits, appeals of adverse legal determinations and permit applications, and more. *Id.* ¶¶ 446-47, 456, 459. Plaintiffs allege that

Defendants retaliated against Plaintiffs for exercising their free speech rights through a "policy, practice and custom of Defendant Township of Weehawken and Mayor Turner's administration designed to intimidate and chill free speech." *Id.* ¶¶ 448-49, 457-58.  According to Plaintiffs, their "decision to exercise their First Amendment rights was a substantial and motivating force behind Defendants' retaliation." *Id.* ¶ 460.[5]

Defendants argue that Plaintiffs fail to set forth a violation of their First Amendment rights to free speech.  Def. Br. at 29.  Defendants claim that "[f]rom the record evidence it is obvious Plaintiffs continually fail to follow applicable laws and court orders.  The fact that they spoke out is of no consequence." *Id.* at 34.  Defendants add that "[t]here is absolutely no proof that Plaintiffs' free speech rights were chilled, or that they suffered any sort of retaliation." *Id.* at 30.  Defendants continue that Plaintiffs "cannot demonstrate any causal connection between their speech and the actions taken by the Township in an effort to minimize health and safety issues caused by Plaintiffs' [sic] and their property, and their failure to maintain the slope as required by law." *Id.* at 32-33.  Plaintiffs respond that they "have performed numerous discrete First Amendment activities, and the factual record would permit a rational jury to conclude the Weehawken Defendants' conduct was substantially motivated to retaliate against Plaintiffs and intimidate them for exercising their First Amendment rights."  Pl. Opp. at 21.

Since the continuing violations doctrine does not apply, the Court only considers conduct that occurred between December 3, 2011 and April 10, 2017, the date of the filing of the TAC.

---

[5] Plaintiffs opposition brief asserts that "Plaintiffs' First Amendment claims should be construed to include denial of access to court process." Pl. Opp. at 27.  However, denial of access to court process was not asserted in the TAC and, as a result, is not considered herein. *See Anderson v. DSM N.V.*, 589 F. Supp. 2d 528, 534 n.5 (D.N.J. 2008) (declining to consider allegations that were not pled in the complaint and were only raised for the first time in opposition to a motion for summary judgment).

Plaintiffs claim that "the totality of the factual record shows … the Weehawken Defendants repeatedly interfere with Plaintiffs any time they seek to develop or otherwise enjoy the use of their Property."  However, the bulk of specific examples of retaliation that Plaintiffs provide predate December 3, 2011.  For example, Plaintiffs point to public comments made after the Natsis I litigation and the commencement of the Natsis II litigation as retaliatory acts, both of which fall outside of the statute of limitations.  Pl. Opp. at 21.

It is clear that Plaintiffs satisfy the first element of their free speech retaliation claim, having engaged in multiple forms of protected speech activity, including complaints to government entities, reporting local government officials to media sources, and initiation of legal actions.  *See Bradshaw v. Twp. of Middleton*, 296 F. Supp. 2d 526, 546 (D.N.J. 2006) (stating that "[t]he First Amendment guarantees 'the right of the people . . . to petition the Government for redress of grievances'" and that citizens have the right to be free from government retaliation for exercising this right).

However, as to alleged retaliatory actions between December 3, 2011 and April 10, 2017, Plaintiffs fail to provide evidence as to the third element, a causal link between the constitutionally protected conduct and the retaliatory action.  Plaintiffs claim that "[i]n 2014 and 2015, the Township of Weehawken revived numerous summonses and complaints against Plaintiffs that were many years old and had never received a hearing."  Pl. Supp. SOMF ¶ 275.  Plaintiffs argue that "Weehawken Defendants instituted numerous criminal complaints against Plaintiffs … left these complaints in abeyance, and then relisted them when Plaintiffs commenced this litigation so they could further undermine First Amendment rights."  Pl. Opp.at 24.  In response, Defendants deny that "the Township 'revived' the summonses," and claimed "[t]he summonses were brought based upon change of venue."  Def. Resp. to Pl. Supp. SOMF ¶ 275.

The evidence supports Defendants' claim that there was a change of venue due to conflicts of interest between Plaintiffs and the Weehawken Municipal Court stemming from complaints filed. *See* D.E. 218, Ex. 152.  Furthermore, Plaintiffs fail to establish that there is an unusually suggestive temporal proximity between the protected activity, Plaintiffs filing this federal litigation, and the allegedly retaliatory action, the revival of old summonses and complaints. Plaintiffs' evidence reflects that in August 2015, Plaintiffs were summonsed to appear in the Bayonne Municipal Court for "assorted" complaints.  D.E. 218, Ex. 151.  Plaintiffs initiated the current litigation on December 3, 2013, yet the alleged retaliatory action did not take place until approximately eighteen months later.  The temporal proximity between December 2013 and August 2015 is too remote to draw a reasonable inference as to the necessary causal link.  Plaintiffs also broadly claim that the denial of permits, selection of contractors by the Township, and the 2012 arrest of Konstantinos constitute free speech retaliation.  Pl. Opp. at 21-22, 26.  However, as to each of these instances, Plaintiffs fail to demonstrate the necessary temporal and causal connections between their exercises of free speech and the retaliatory actions.  Plaintiffs merely list actions they deem retaliatory and broadly argue that a causal connection exists.  Plaintiffs fail to tie their protected speech activities to specific retaliatory actions in the relevant timeframe.

Plaintiffs fail to demonstrate any genuine dispute as to any material fact in the pertinent timeframe.  Therefore, summary judgment is granted as to Counts Three and Four.

### 2.  Count Nine: Municipal Liability

Count Nine of the TAC alleges municipal liability under Section 1983 against Defendant Weehawken.  TAC ¶¶ 504-510.  Plaintiffs assert that "Weehawken has a policy, custom, and practice of retaliating against property owners that take legal action or exercise their free speech against the Township of Weehawken and/or Mayor Turner."  *Id.* ¶ 506.  Plaintiffs allege that the

policy, custom, and practice is carried out "in part, by members of the Weehawken Police Department through the filing of false reports and frivolous complaints, as well as through the Weehawken Building Department by abusing the construction permit application procedure and maliciously issuing summonses/citations." *Id.* ¶ 507.  The alleged retaliatory acts include "false arrests, illegal searches, commencing frivolous litigation, taking Plaintiffs' property for regulation and assessment of violations, denial and destruction of permit applications without legitimate reason, arbitrary and capricious denial of municipal services, and other forms of harassment designed to retaliate and intimidate." *Id.* ¶ 508.

Defendants claim that Plaintiffs have failed to adduce any proof of a policy or custom of retaliation by the Township.  Def. Br. at 71.  Plaintiffs respond that Defendant Tattoli and Mayor Turner acted as final policymakers commencing and enforcing a policy or custom of free speech retaliation.  Pl. Opp. at 82-84.

A municipality cannot be liable under Section 1983 for the acts of its employees on the basis of *respondeat superior.  Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)).  Rather, to hold a municipality liable, a plaintiff must demonstrate that the violation of rights was caused by a municipal policy or custom.  *Id.*  To sufficiently state a claim based on a municipal policy or custom, a plaintiff must identify a policy or custom that "violates the Constitution or . . . while not unconstitutional itself, is the moving force behind the constitutional tort of one of its employees."  *Id.* (quoting *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1027 (3d Cir. 1991)).  "In other words, the plaintiff must show that the municipality, through one of its policymakers, affirmatively proclaimed the policy, or acquiesced in the widespread custom, that caused the violation."  *Noble v. City of Camden*, 112 F. Supp. 3d 208, 221 (D.N.J. 2015) (internal citation omitted).  "A plaintiff

may show the existence of a *policy* when a decision-maker with final authority issues an official proclamation, policy, or edict." *Id*. (emphasis added) (internal quotations and citations omitted); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("'policy' generally implies a course of action consciously chosen from among various alternatives."). "[A] *custom* may be established by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id*. (emphasis added) (internal quotations and citations omitted).

Ultimately, "[a] plaintiff must identify the challenged policy [or custom], attribute it to the [municipality] itself, and show a causal link between execution of the policy and the injury suffered." *Kranson v. Valley Crest Nursing Home*, 755 F.2d 46, 51 (3d Cir. 1985) (internal citation and quotation marks omitted). If the policy or custom does not violate federal law on its face, "causation can only be established by 'demonstrating that the municipal action was taken with deliberate indifference as to its known or obvious consequence.'" *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (quoting *Board of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997)).

To sufficiently state a claim for municipal liability, Plaintiffs must identify a policy, custom, or practice that either violates the Constitution or is the moving force behind a constitutional tort of an employee. *Thomas*, 749 F.3d at 222. The underlying constitutional tort alleged in this municipal liability claim is free speech retaliation. However, as discussed above, the Court holds that Plaintiffs fail to establish a claim for free speech retaliation. Without a constitutional violation, the City cannot be held liable under *Monell*. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573, 89 L. Ed. 2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental

27

regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."). So too here, since Plaintiffs failed to establish an underlying constitutional tort, Plaintiffs' claim for municipal liability fails.[6]   Therefore, Defendants' motion for summary judgment is granted as to Count Nine.

### 3.   Count Five: False Arrest

Count Five of Plaintiffs' TAC asserts false arrest by Defendant Cannon on February 6, 2002; by Defendant Hablitz on January 28, 2004[7]; by Defendant Same on April 5, 2009[8]; and by Defendants Tattoli, Hodkinson, and unnamed members of the Weehawken Police Department on April 5, 2012. TAC ¶¶ 463-76. "An arrest made without probable cause creates a cause of action for false arrest under 42 U.S.C. § 1983." *O'Connor v. City of Philadelphia*, 233 F. App'x 161, 164 (3d Cir. 2007) (citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)). "The proper inquiry in a Section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634-35 (3d Cir. 1995) (quoting *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)).

---

[6] Plaintiffs also argue in their opposition brief that Mayor Turner and Defendant Tattoli personally retaliated against Plaintiffs in their capacities as officials with final policymaking authority. Pl. Opp. at 83-84. Plaintiffs rely on *Pembaur v. Cincinnati*, 475 U.S. 469 (1986), which "makes clear that an official with policymaking authority can create official policy, even by rendering a single decision." *McGreevy v. Stroup*, 413 F.3d 359, 367-68 (3d Cir. 2005). However, since Plaintiffs failed to establish an underlying constitutional violation of free speech retaliation, Plaintiffs' *Pembaur* arguments must also fail.

[7] As mentioned earlier in this Opinion and in the prior motion to dismiss opinion, Plaintiffs' allegations pertaining to the 2002 and 2004 arrests by Defendants Cannon and Hablitz, respectfully, are not barred by the statute of limitations because they waived the defense in the 2004 consent decree. D.E. 147.

[8] Konstantinos' false arrest claim for April 2009 was dismissed on March 10, 2017. D.E. 160.

"Where the police lack probable cause to make an arrest, the arrestee has a claim under [Section] 1983 for false imprisonment based on a detention pursuant to that arrest." *Id.* at 636 (quoting *Thomas v. Kippermann*, 846 F.2d 1009, 1011 (5th Cir. 1988)). The inquiry into wrongful arrest under the New Jersey Constitution is the same. *See, e.g. Geissler v. City of Atlantic City*, 198 F. Supp. 3d 389, 397 (D.N.J. 2016) ("Under *federal and New Jersey law*, a plaintiff states a claim for false imprisonment by demonstrating that (1) she was detained and (2) the detention was unlawful." (emphasis added)).

Probable cause exists if, at the time a suspect is arrested, "the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005). In determining whether a police officer had probable cause to arrest, a court must review the totality of the circumstances of the events leading up to the arrest and must do so from the "standpoint of an objectively reasonable police officer[.]" *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (internal citation omitted). "A police officer may be liable for civil damages for an arrest if 'no reasonable competent officer' would conclude that probable cause exists." *Wilson v. Russo*, 212 F.3d 781, 789-90 (3d Cir. 2000) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

A defendant is entitled to qualified immunity for a Section 1983 false arrest claim "unless it would have been clear to a reasonable officer there was no probable cause to arrest." *Frohner v. City of Wildwood*, No. 07-1174, 2008 WL 5102460, at *6 (D.N.J. Dec. 1, 2008) (quoting *Giles v. Davis*, 427 F.3d 197, 205 (3d Cir. 2005)). Moreover, this question must be considered within the context of the specific facts of the case. *Thomas*, 463 F.3d at 300 (quoting *Saucier,* 533 U.S. at 201). As such, the proper inquiry is whether a reasonable officer in the defendant's shoes would

29

have understood that he did not have probable cause to arrest the plaintiff. *Janowski*, 2017 WL 18210978, at *6 ("Courts must instead objectively assess whether, at the time of the arrest and based upon the facts known to the officer, probable cause existed 'as to any offense that could be charged under the circumstances.'") (quoting *Wright*, 409 F.3d at 606)).

Defendants move for summary judgment on the February 6, 2002 false arrest claim, arguing that probable cause existed for the arrest and that Defendant Cannon is entitled to qualified immunity. Def. Br. at 44-46, 51. Plaintiffs reply that the 2002 arrest was not supported by probable cause "because Defendant Cannon made a false report to blame [Konstantinos] for the sewer easement line's failure." Pl. Opp. at 36. Plaintiffs continue that Defendant Cannon "did not have any personal knowledge to support probable cause to believe that Plaintiff Konstantinos Natsis broke the sewer pipe" and filed a "false and malicious report." Pl. Supp. SOMF ¶¶ 86-88. The investigative report of the incident signed by Defendant Cannon demonstrates that three of Plaintiffs' neighbors (Richard Allgayer, Igor Sidorets, and Tracy Pamperin) "gave hand written statements that after the pipe was repaired by the city [Konstantinos] broke the pipe with a pick-axe." D.E. 202, Ex. JJJJ. Defendant Cannon testified that "probable cause for the arrest existed based upon the witness statements made to him." DSOMF ¶ 224; D.E. 202, Ex. KKKK at 52:20-54:19. Plaintiffs claim that the witness statements "were hearsay or otherwise did not support probable cause as they were self-serving, not proximate in time, and failed to establish a basis to hold [Konstantinos] accountable for destroying the sewer easement line." Pl. Opp. at 39.

Defendants note that, aside from the investigative report itself and deposition testimony, "[t]he Township has no further documents regarding this arrest as the information was signed out for trial in the Hudson County Superior Court in 2002 and never returned." DSOMF ¶ 226.

Plaintiffs, in turn, "without information to admit or deny," contend that "the warrant application and supporting documents never existed."  Pl. Resp. to DSOMF ¶ 226.

Plaintiffs fail to introduce a genuine issue of material fact as to whether probable cause existed.  The issue is whether the three witnesses actually made the statements, inculpating Konstantinos, to the officer.  Plaintiffs provide no evidence that their neighbors did not actually make statements to Defendant Cannon.    Probable cause may rest upon hearsay.  *Franks v. Delaware*, 438 U.S. 154, 165 (1978).  Defendant Cannon could reasonably rely on three witness statements to establish probable cause.  Plaintiffs point to no legal authority requiring Defendant Cannon to have personal knowledge, in addition to the witness statements, to support probable cause.  In Plaintiffs' opposition brief, Plaintiffs also argue that in arresting Plaintiff in 2002, "Defendant Cannon was abusing his police powers against Plaintiffs once they filed the Natsis I litigation."  Pl. Opp. at 36.  However, Plaintiffs' supplemental statement of material facts notes that Plaintiffs commenced the Natsis I litigation on May 30, 2002, months *after* Defendant Cannon arrested Konstantinos.  Pl. Supp. SOMF ¶ 96.

There is no genuine dispute of material fact as to whether probable cause existed for the 2002 arrest.  As a result, the Court grants Defendants' motion for summary judgment as to the 2002 false arrest claim.

Defendants also move for summary judgment on the January 28, 2004 false arrest claim, arguing that probable cause existed for the arrest and that Defendant Hablitz is entitled to qualified immunity.  Def. Br. at 46-48, 51.  Plaintiffs claim Defendant Hablitz did not have probable cause to arrest Konstantinos.  Pl. Opp. at 43-45.  Plaintiffs assert that Defendant Hablitz arrested Konstantinos for "failing to produce identification so that he could issue a summons for throwing snow into a public area in violation of a local Weehawken ordinance."  Pl. Supp. SOMF ¶ 105.

Defendant Hablitz testified in November 2017 "that he arrested [Konstantinos] because he was attempting to issue a summons and [Konstantinos] was not cooperating." DSOMF ¶ 229.

Critically, the parties present different underlying facts of the arrest. Defendant Hoblitz stated in his deposition testimony that Konstantinos was "obstructing" and "fled into his home to avoid being issued the summons." D.E. 202, Ex. MMMM. Plaintiffs, on the other hand, indicate that Helen was retrieving Konstantinos' identification from inside the house, Pl. Supp. SOMF ¶ 105, and that Konstantinos "came back outside on his own accord[.]" *Id.* ¶ 106. The parties' conflicting representations call into question whether Defendant Hablitz had probable cause at the time he executed the arrest, which is material to the false arrest claim. Because a genuine dispute of material fact exists, the Court denies Defendants' summary judgment motion as to the 2004 false arrest claim.

Defendants next move for summary judgment on the April 5, 2012 false arrest claim. Def. Br. at 48. Defendants first argue that the claim must be dismissed because Plaintiffs fail to identify the officer who arrested Konstantinos. *Id.* at 48. Alternately, Defendants argue that the claim must be dismissed because Konstantinos was arrested pursuant to a valid warrant. *Id.* at 50-51. Plaintiffs respond that there was no probable cause to arrest Konstantinos because Defendants Tattoli and Hodkinson misled the municipal judge through false testimony. Pl. Opp. at 45-46.

Defendant Tattoli, a construction code official in Weehawken, was a witness and complainant, but did not execute the arrest. *Id.* ¶¶ 3, 238-39, 243. Plaintiffs do not name the police officers who executed the April 5, 2012 arrest, referring to them only as "[m]embers of Defendant Weehawken's Police Department" in the TAC. *See* TAC ¶ 474; DSOMF ¶ 245.

"The proper inquiry in a Section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause

to believe the person arrested had committed the offense." *Groman*, 47 F.3d at 634-35 (quoting *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)).  Critically, even assuming Plaintiffs' allegation that Defendants Tattoli and Hodkinson misled the municipal judge through false testimony, Plaintiffs have brought forth no evidence that the arresting officers knew or should have known that the information provided by Defendants Tattoli and Hodkinson was untrustworthy.  The arrest was made pursuant to an arrest warrant.[9]  As the Supreme Court stated in *United States v. Leon,* 468 U.S. 897, 921 (1984), "[in] the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient."  As the Court found, "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations."  *Id.*  In this case, Plaintiffs failed to demonstrate that the unnamed arresting officers did not sincerely believe the warrant was valid and that their belief was objectively reasonable.  *See United States v. Katzin*, 769 F.3d 163, 171 (3d Cir. 2014) ("Where the particular facts of a case indicate that law enforcement officers 'act[ed] with an objectively 'reasonable good-faith belief' that their conduct [was] lawful, or when their conduct invite[d] only simple, 'isolated' negligence,' there is no illicit conduct to deter.") (internal citations omitted).  For these reasons, the 2012 false arrest claim is dismissed as to the unnamed officers.

---

[9] While Plaintiffs claim "there was no arrest warrant application presented to a magistrate judge to determine whether there was sufficient evidence to support a finding of probable cause," Pl. Supp. SOMF ¶ 245, Plaintiffs *themselves* attach a Weehawken Township Municipal Court "Probable Cause Determination and Issuance of Warrant," *see* D.E. 218, Ex. 146.  The document is dated April 5, 2012, lists the complainant as Defendant Tattoli, and states "probable cause for this complaint is based on witnesses/officers observations and written statements."  *Id.*  It further states "[p]robable cause IS found for the issuance of this complaint … to any peace office or other authorized person: pursuant to this warrant you are hereby commanded to arrest the named Defendant [Konstantinos Natsis][.]"  *Id.*

As to Defendant Tattoli, it appears Plaintiffs are making a claim for causing a false arrest. Plaintiffs state in their opposition brief that "the false statements of Defendant Tattoli should be considered actions by a state actor that proximately caused [Konstantinos] to be arrested without probable cause." Pl. Opp. at 46.  Plaintiffs cite to *Pomykacz v. Borough of W. Wildwood*, 438 F. Supp. 2d 504, 510-11 (D.N.J. 2006) in support of the proposition that in that case, the "mayor's statement made to obtain [a] warrant based on probable cause states a claim for false arrest[.]" *Id.* However, Defendants argue that *Pomykacz* does not support Plaintiff's position that Defendant Tattoli can be held liable for a 1983 false arrest claim.  Def. Reply at 18-20.

In *Pomykacz*, the plaintiff, a "citizen activist," became concerned about issues in the town and began "monitoring" a police officer and mayor.  *Pomykacz*, 438 F. Supp. 2d at 506-07.  After tensions grew, the police officer and mayor jointly called the county prosecutor to discuss filing stalking charges against the plaintiff.  *Id.* at 508.  The prosecutor "advised [the police officer] about the necessary facts to support a stalking charge" and after the meeting, the police officer called a municipal court judge to obtain a warrant for plaintiff's arrest.  *Id.*  The record reflects that the police officer told the judge her version of the events, but "[t]he record does not indicate what, if any, specific information was given about [plaintiff's] actions with respect to [the mayor]," and the warrant for plaintiff's arrest was signed.  *Id.*

The police officer and mayor argued that they were not subject to Section 1983 liability because they were acting as private citizens, and not under the color of state law, when they made the criminal complaint.  *Id.* at 509.  The district judge noted that "private citizens do not have such ease of access to the County Prosecutor's Office or judges at any time" and that the police officer and mayor "used their authority as law enforcement officials to contact the county prosecutor directly."  *Id.* at 510.  Therefore, the *Pomykacz* court found that the police officer and mayor were

34

"[a]t the very least … acting simultaneously as private citizens and law enforcement officials at that time" and thus subject to Section 1983 liability.  *Id.* at 510.  As to the false arrest claim, the Court found that disputed issues of fact existed as to "whether [the police officer and mayor] made false statements to [the judge] when applying for the warrant."  *Id.*

Defendants argue that the facts here are different because "[Defendant] Tattoli cannot be deemed a law enforcement official for purposes of liability."  Def. Reply at 19.  Further, Defendant Tattoli "was not circumventing the system as did the parties in *Pomykacz*, one of them being a police officer."  *Id.*  The Court agrees that Defendant Tattoli was not acting in a law enforcement capacity and that *Pomykacz* alone is not enough to support the broad proposition that affiants who are public officials may be held liable for Section 1983 false arrest claims.

Instead, the Court adopts the United States District Court of the Northern District of Iowa's test for determining when to hold public officials liable under Section 1983 for causing a false arrest:

> To hold a public official liable under Section 1983 for causing a false arrest or imprisonment, a plaintiff must show that the official "instigated" the arrest.  *See, e.g., Busch v. City of Anthon, Iowa,* 173 F. Supp. 2d 876, 895 (N.D. Iowa 2001).  This means much more than simply reporting information to law enforcement.  Indeed: "[t]here is no liability for merely giving information to legal authorities, who are left entirely free to use their own judgment, or for identifying the plaintiff as the person wanted."  *Id.* (quoting *Dixon v. Hy–Vee, Inc.,* No. 00-1234, 2001 WL 912738 (Iowa Ct. App. Aug. 15, 2001)).  Instead, the official must have knowingly supplied false information, which means "supplying information the supplier knows is false, and does not mean the mere good faith supplying of mistaken information."  *Id.* (citing *Powers v. Carvalho,* 117 R.I. 519, 368 A.2d 1242, 1248 (1977)).

*Perzynski v. Cerro Gordo Cty., Iowa*, 953 F. Supp. 2d 916, 927 (N.D. Iowa 2013), *aff'd,* 557 F. App'x 619 (8th Cir. 2014).  To hold Defendant Tattoli liable as a public official for causing a false

arrest under Section 1938, Plaintiffs must demonstrate that Defendant Tattoli knowingly supplied false information.  However, as Plaintiffs admit, Defendant Tattoli "did not have personal knowledge, and instead was basing his criminal complaint on Mrs. Hodkinson's false report."  Pl. Resp. to DSOMF ¶ 239.  Plaintiffs critically fail to point to any evidence that Defendant Tattoli knew that Defendant Hodkinson's report was false, and therefore that Defendant Tattoli himself knowingly supplied false information.  As a result, Plaintiffs do not demonstrate a genuine issue of material fact as to whether Defendant Tattoli knowingly supplied false information.  As a result, Plaintiffs' claim against Defendant Tattoli for causing a false arrest are dismissed.

For the reasons stated above, the Court grants Defendants' summary judgment motion as to the 2012 false arrest claim and the claim must be dismissed as against the unnamed officers and Defendant Tattoli.

### i.   Count Six: Malicious Prosecution

Count Six of the TAC asserts malicious prosecution.  TAC ¶¶ 477-58.  Plaintiffs allege that Defendants Tattoli, Hodkinson, and unnamed members of the Weehawken Police Department lacked probable cause and "maliciously filed charges against Plaintiff Konstantinos Natsis on or about April 5, 2012 to intimidate him in retaliation of his prior exercise of his constitutional rights." *Id.* ¶ 480.  Plaintiffs add that "on other occasions, as [set] forth in this Complaint, criminal charges and municipal ordinance summons[es] were issued to Plaintiffs without a legitimate basis." *Id.* ¶ 482.  Plaintiffs then generally state that "criminal charges and ordinance violations were dismissed in favor of Plaintiff Konstantinos Natsis." *Id.* ¶ 484.

For a Section 1983 malicious prosecution claim, a plaintiff must establish that (1) defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or

36

for a purpose other than bringing the plaintiff to justice; and (5) plaintiff suffered from a "deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *See Kossler v. Crisanti*, 564 F.3d 181, 186 (3d Cir. 2009) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)). The elements of a malicious prosecution claim under New Jersey law are as follows: (1) the defendant instituted a criminal action against the plaintiff; (2) the action was actuated by malice; (3) there was an absence of probable cause; and (4) the proceeding terminated in the plaintiff's favor. *Brunson v. Affinity Fed. Credit Union*, 199 N.J. 381, 393-94 (2009) (quoting *Helmy v. City of Jersey City*, 178 N.J. 183, 190 (2003)). Plaintiffs must satisfy each of the elements of malicious prosecution. *Kossler*, 564 F.3d at 186.

Defendants move for summary judgment on the basis that Plaintiffs fail to set forth a claim for malicious prosecution.[10] Def. Br. at 55. Defendants' brief sets forth eighteen indictable offenses and municipal citations from 2000 to 2008, *id.* at 56-57, which is only a subset of the charges and ordinances alleged in the TAC. Defendants argue that Plaintiffs do not adequately establish the favorable termination element, that Plaintiffs fail to satisfy the malice element, that Plaintiffs suffered no deprivation of liberty, and that probable cause did exist for the 2002 and 2004 arrests. *Id.* at 56-64. Plaintiffs oppose the motion, arguing that "Plaintiffs were subjected to numerous criminal proceedings without probable cause that ended in Plaintiffs' favor." Pl. Opp. at 57.

Defendants argue that "to the extent this claim is asserted as to [Defendant Township of Weehawken], Plaintiffs fail to show that they are entitled to relief, as the City is incapable of acting with malice." Def. Br. at 58. To the extent the claim is asserted against Defendant Township of

---

[10] In arguing that Plaintiffs "fail to state a claim," Defendants again refer to the motion to dismiss legal standard instead of the summary judgment standard.

Weehawken, Plaintiff must prove acts pursuant to an unconstitutional policy, custom, or practice. *Monell*, 436 U.S. at 690-91.  Plaintiffs have not offered sufficient evidence of any unconstitutional policy, custom, or practice pursuant to which Defendants have engaged in malicious prosecution. Therefore, the Court dismisses the malicious prosecution claims as to Defendant Township of Weehawken.

However, as to the remaining Defendants, Defendants have not shouldered their burden to prove that there is no genuine dispute as to any material fact.  Defendants merely list eighteen instances of summonses, notices of violations, and arrests, but fail to address why Plaintiff has failed to meet the malicious prosecution elements for each.[11]  Instead, Defendants briefly and broadly allege that certain elements have not been met as to *all* summonses, notices, and arrests. *See* Def Br. at 55-64.  For example, in support of Defendants' claim that Plaintiffs fail to establish the favorable termination element, Defendants' entire argument (excluding related case law) consists of the following sentence:

> Here, Plaintiffs have failed to meet the necessary requirements to establish that the complaints issued against them terminated in their favor, as a dismissal by the court due to lack of discovery and age is hardly a finding of innocence of the accused, and therefore this element is not met.

Def. Br. at 59.  Defendants' arguments regarding probable cause, malice, and deprivation of liberty are similarly conclusory and overbroad.

While Plaintiffs' allegations were themselves broad in referring to multiple charges, Plaintiffs at least specifically alleged one malicious prosecution claim as to the charges stemming

---

[11] Konstantinos' arrest claim of 2002 is a notable exception, because Defendants sufficiently proved the existence of probable cause in the false arrest claim section of their brief.  *See* Def. Br. at 44-46.  Because the Court found probable cause existed in Plaintiff's 2002 arrest, any malicious prosecution claim as to the 2002 arrest is dismissed.

from the April 5, 2012 arrest.  *See* TAC ¶¶ 478-80.  Defendants entirely fail to address the charges

stemming from the 2012 arrest in their malicious prosecution argument.  Defendants also failed to

cite to the extensive evidentiary record to support their motion, instead referring only to the TAC

and one exhibit.  The Court denies summary judgment as to the malicious prosecution claims

except as to Defendant Township of Weehawken and Konstantinos' 2002 arrest claim.

### ii.    Count Seven: Abuse of Process

Count Seven asserts a cause of action for abuse of process.  TAC ¶¶ 486-95.  Plaintiffs

allege that Defendants "intentionally and maliciously continue to obstruct the permit application

process to prevent Plaintiffs from cleaning, clearing, and developing their Property."  *Id.* ¶ 589.

They claim that "since filing this litigation, Plaintiffs have not received any permits despite the

fact their contractors have represented to [Defendant Tattoli] that they will follow all applicable

rules and regulations."  *Id.* ¶ 588.  Plaintiffs allege that "Defendants, in particular Defendant

Tattoli, have misused and abused the permitting process through the Weehawken Building

Department by using said process to intimidate and retaliate against Plaintiffs while also obtaining

adverse state court rulings to be used against Plaintiffs in this civil rights litigation."  *Id.* ¶ 491.

Plaintiffs add that Defendants are "using the criminal complaint process to falsely accuse and

charge Plaintiffs to bolster their own position in a civil rights case."  *Id.* ¶ 492.

A claim for "abuse of process is concerned with perversion of process *after* litigation has

begun."  *Gebhart v. Steffen*, 574 F. App'x 156, 160 (3d Cir. 2014) (emphasis added) (internal

quotation marks omitted).  In order to assert a claim for abuse of process, "the improper use must

be the *primary* purpose of the proceeding and there is no action for abuse of process when the

process is used for the purpose for which it is intended, but there is an incidental motive or spite

or ulterior purpose of benefit to the defendant." *Id.*  The Appellate Division has described abuse

of process as follows:

> The gist of the tort is misusing or misapplying process justified in
> itself for an end other than that which it was designed to accomplish.
> The purpose for which the process is used, once it is issued, is the
> only thing of importance.   The essential elements of abuse of
> process, as the tort has developed, have been stated to be: first, an
> ulterior purpose, and second, a wil[l]ful act in the use of the process
> not proper in the regular conduct of the proceeding.  Some definite
> act or threat not authorized by the process, or aimed at an objective
> not legitimate the use of the process, is required; and there is no
> liability where the defendant has done nothing more than carry out
> the process to its authorized conclusion, even though with bad
> intentions.  The improper purpose usually takes the form of coercion
> to obtain a collateral advantage, such as the surrender of property,
> by the use of the process as a threat or club.  There is, in other words,
> a form of extortion, and it is what is done in the course of
> negotiation, rather than the issuance or any formal use of the process
> itself, which constitutes the tort.

*Gambocz v. Apel*, 102 N.J. Super. 123, 128 (App. Div. 1968) (internal quotation marks omitted).

Defendants note that Plaintiffs allege wrongdoing as to Defendant Tattoli in particular and

"Defendants" collectively.  Def. Br. at 65; TAC ¶ 491.  Moreover, as Defendants point out, this

Court's March 10, 2017 Opinion on Defendants' partial motion to dismiss held that an allegation

of abuse of process against Defendants collectively is overbroad.  D.E. 147.  The only Defendant

specifically named in Plaintiffs' TAC is Defendant Tattoli.  Therefore, the Court deems Plaintiffs'

allegations to be against Defendant Tattoli alone.

Additionally, Plaintiffs' abuse of process claim alleges wrongdoing Plaintiffs have suffered

"since filing this litigation."  TAC ¶ 488.  Because Plaintiffs' TAC alleges that "*since filing this

litigation*," Defendants have maliciously misused the permit process, the time frame for Plaintiffs'

abuse of process claim is December 2013 (the initiation of this litigation) through April 2017 (the

filing of the Third Amended Complaint).   The Court does consider allegations set forth in

Plaintiffs' opposition brief that were not included in the TAC because a complaint may not be amended through opposition briefs. *See Anderson*, 589 F. Supp. 2d at 534 n.5.

Plaintiffs' remaining abuse of process claims concern Defendant Tattoli's failure to issue permits following the HEPSCD's January 2013 stop work order. Defendants argue that Plaintiffs' cause of action for abuse of process must fail. Def. Br. at 65. Defendants claim that while Plaintiffs were repeatedly advised between 2013 and 2017 of their obligations under the stop work order issued January 22, 2013, not once did Plaintiffs comply with the order. *Id.* at 66. Defendants also point to Konstantinos' July 28, 2015 complaint in the Superior Court of New Jersey, Chancery Division, "challenging denial of an application filed with the Township to obtain a permit allowing [Konstantinos] to remove 70 feet by 25 feet of soil from his property." DSOMF ¶ 33; Def. Brief at 68. After a hearing on the matter on April 3, 2017, the Honorable Christine M. Vanek, J.S.C., issued an opinion determining that Weehawken's failure to issue the permit dated April 27, 2015 was "reasonably grounded in evidence in the record" related to the existence of the stop work order and was "not arbitrary, capricious, or unreasonable." DSOMF ¶ 33; D.E. 202, Ex. DD; Def Br. at 68. According to Defendants, "[w]hat Plaintiffs fail to realize is that the Township was not able to issue any permits due to the Stop Work Order," therefore there was no abuse of process in denying the permits. Def. Br. at 67.

Plaintiffs oppose the motion, claiming "summary judgment should be denied because the Weehawken Defendants have abused legal processes for self-interested purposes and to interfere with Plaintiffs' constitutional rights." Pl. Opp. at 71. Plaintiffs, however, reference evidence outside of the relevant 2013-2017 time period. Additionally, Plaintiffs argue that "the aforementioned abuse of process should also be construed as a denial of access to courts claim" and "a separate abuse of process related to the Weehawken Defendants attempts to undermine

Plaintiffs' First Amendment rights in this litigation." *Id.* at 77-78.  However, these new claims – raised in Plaintiffs' opposition – were not raised in the TAC.  *See Anderson*, 589 F. Supp. 2d at 534 n .5 (ruling that a complaint cannot be amended through an opposition brief).

Critically, Plaintiffs fail to show that there is a genuine dispute as to any material fact regarding the denial of permits between December 2013 and April 2017.  In fact, Plaintiffs initially failed to provide evidence that Plaintiffs requested the permits.  Yet, in their supplemental statements of material facts, Plaintiffs claim that "[e]ven though the HEPSCD has removed the stop work order on Plaintiffs' property, the Township of Weehawken has refused to permit Plaintiffs to remove more any [sic] soil from their site without submitting an engineering plan." Pl. Supp. SOMF ¶ 281.   However, Plaintiffs fail to provide a timeframe for the Township's denial of permits, and the exhibits Plaintiffs attach in support of this claim all fall outside of the pertinent December 2013 to April 2017 time period.  *See* D.E. 218, Ex. 104 (emails dated February 2013); Ex. 105 (undated stope stability plans); Ex. 127 (emails dated February 2013); Ex. 129 (emails dated July 2019); Ex. 147 (emails dated February 2013); Ex. 148 (emails dated February 2013); Ex. 149 (emails dated March 2013); Ex. 170 (emails dated April 2018).

Therefore, in failing to point the Court toward evidence that Defendant Tattoli (or any Defendant for that matter) denied permits to Plaintiffs during the pertinent time period, Plaintiffs have failed to establish a genuine dispute of material fact.  Therefore, summary judgment is granted as to the abuse of process claim.

### iii.   Count Eleven: Taking Without Just Compensation

Count Eleven asserts a cause of action for taking of property without just compensation. TAC ¶¶ 517-24.  Plaintiffs allege that Defendants' actions constituted a taking by denying and destroying Plaintiffs' permit applications;  intimidating and deterring Plaintiffs' engineers,

42

architects, and contractors; and selectively enforcing ordinances against Plaintiffs "thereby precluding Plaintiffs from obtaining the highest and best use of their Property." TAC ¶ 518. Plaintiffs also allege that Defendant Weehawken "installed a sump pump system on the Palisades Cliff slope area without proper NJDEP permits or notice" and that the system leaks sewage and fecal matter onto the Property. *Id.* ¶¶ 521-22.

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. Amend. V. "The Takings Clause applies to state action through the Fourteenth Amendment." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 370 (3d Cir. 2012). "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). "Government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster … such 'regulatory takings' may be compensable under the Fifth Amendment." *Id.*

Supreme Court precedent identifies two categories of regulatory action that are generally deemed *per se* takings under the Fifth Amendment:

> First, where government requires an owner to suffer a permanent physical invasion of her property – however minor – it must provide just compensation. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking). A second categorical rule applies to regulations that completely deprive an owner of "*all* economically beneficial us[e] of her property. *Lucas*, 505 U.S. at 1019, 112 S. Ct. 2886 (emphasis in original).

*Id.* Outside of these two categories, the Supreme Court has identified several factors to evaluate regulatory takings claims, including primarily "the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct

investment-backed expectations." *Id.* (citing *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978)).  Another factor is "'the character of the governmental action' – for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'"  *Id.*

Defendants' cites *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985) for the proposition that plaintiffs must exhaust state remedies before claiming a violation of the Takings Clause.  Defendants argue that since Plaintiffs have not exhausted their state administrative remedies, their taking claim is unripe under *Williamson County*.  Def. Br. at 82.  However, *Williamson County* was overruled on June 21, 2019 in *Knick v. Township of Scott*, - U.S. -, 139 S. Ct. 2162, 2170 (2019), two months after Defendants filed their motion for summary judgment.  The *Knick* Court ruled as follows:

> [T]he state-litigation requirement imposes an unjustifiable burden on takings plaintiffs, conflicts with the rest of our takings jurisprudence, and must be overruled.  A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it.  That does not mean that the government must provide compensation in advance of a taking or risk having its action invalidated: So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities.  But it does mean that the property owner has suffered violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court under § 1983 at that time.

*Id.* at 2167-2168.  As a result, the Court disagrees with Defendants' ripeness argument.

However, Defendants also argue that Plaintiffs' takings claim fails to meet the necessary elements.  Def. Reply at 34-37.  Plaintiffs allege a physical taking through the installation of a

sump pump system on the Palisades Cliff by Defendant Weehawken.   TAC ¶¶ 521-22.[12]

According to the TAC, the sump pump system was installed in September of 2007.  TAC ¶ 294.

However, the proper statute of limitations on a takings claim is six years.  *See 287 Corp. Ctr.*

*Assocs. v. Twp. of Bridgewater*, 101 F.3d 320, 324 (3d Cir. 1996); *Klumpp v. Borough of Avalon*,

202 N.J. 390, 409, 997 A.2d 967, 978 (2010).   Plaintiffs' original Complaint was filed on

December of 2013, D.E. 1, approximately three months outside of the six-year limit. Therefore,

Plaintiffs claim as to the September 2007 taking is dismissed.

As to Plaintiffs' claimed regulatory takings, Defendants assert that the denial of permit

applications and alleged selective enforcement of ordinances does not constitute a deprivation of

all economically viable use of the property.  The Court agrees that Plaintiffs have failed to make a

showing sufficient to establish a deprivation of all economically viable use of the Property.

Similarly, Plaintiffs do not argue that a taking occurred in light of the other factors that a court

must consider when a property owner has not been denied all economically viable use of his or her

property.  Therefore, no genuine issue as to any material fact exists, and Count Eleven is dismissed.

---

[12] Plaintiffs refer to another alleged physical taking in 2004 through Weehawken's selection of contractor J. Fletcher Creamer & Sons, Inc. in their opposition papers, Pl. Opp. at 85-86.  However, Plaintiffs failed to allege this 2004 taking in its TAC, so the Court will not consider it.

IV.     CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Leave to File a Fourth Amended Complaint (D.E. 228) is **DENIED** and Defendants' Motion for Summary Judgment (D.E. 202) is **GRANTED in part** and **DENIED in part**.  Defendants' Motion for Summary Judgment is granted as to Counts One, Two, Three, Four, Five (as to the 2002 and 2012 false arrest claims), Six (as to Defendant Township of Weehawken and Konstantinos' 2002 arrest claim), Seven, Nine, and Eleven and all of those Counts are dismissed.  Summary judgment is denied as to Counts Five (as to the 2004 false arrest claim) and Six (as to all remaining Defendants).  An appropriate Order accompanies this Opinion.


Date: August 10, 2020

John Michael Vazquez, U.S.D.J.

46